UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
SUI-YANG HUANG

                          Plaintiff,

                                                                    09-Civ-8297(HB)

              -against-

ADVANCED BATTERY TECHNOLOGIES, INC.,

                          Defendant.

--------------------------------------------------------------X


MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS
AND IN SUPPORT OF PLAINTIFF'S
PARTIAL MOTION TO SUMMARY JUDGMENT


Dai & Associates, P.C.
Attorneys for Plaintiff
136-20 38th Avenue, Suite 9F
Flushing, NY 11354
718-888-8880

**TABLE OF CONTENTS**

TABLE OF AUTHORITY ................................................................i - iii

PRELIMINARY STATEMENT ...........................................................1

THE MOTION ....................................................................1

    A.    ABAT's Motion to Dismiss ...........................................1

    B.    Dr. Huang's Motion for Partial Summary Judgment....................2

UNDISPUTED FACTS ............................................................2

CHINESE LAW .................................................................4

    A.    Citizenship of the Parties ..........................................4

    B.    Governing Contract Law ..........................................4

    C.    Jurisdiction Over the Contract Claim ...............................5

    D.    Jurisdiction Over the Quasi-Contract and Tort Claims ...............5

ABAT'S "DEFENSES" ...........................................................6

ARGUMENT
POINT I
The Southern District is the Appropriate Forum ...........................7

POINT II
The Death Threats are Actionable ......................................11
    A.    Intentional Infiliction of Emotional Distress ........................11

    B.    Prima Facie Tort ................................................13

    C.    Reliatioin ......................................................14

    D.    Dr. Huang Is Entitled To Partial Summary Judgment ................15

POINT III
Dr. Huang is Entitled to Partial Summary Judgment .......................16

    A.    The Standard for Summary Judgment .............................17

    B.    ABAT Effectively Admits

It Breached the Employment Contract  ……………………………..…………17

C.    ABAT's Potential Defenses Are Bogus  …………………………………...18

D.    Dr. Huang Is Entitled To Partial Summary Judgment  …………………..……18

CONCLUSION  ……………………………………………………………..…….19

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 256 (1986) ...............................................................17

*Bigio v. Coca-Cola Company,*
    448 F.3d 176 (2d Cir. 2006)...........................................................8

*Brady v. Calyon Sec. (USA),*
    406 F. Supp. 2d 307 (S.D.N.Y. 2005) ............................................15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................16, 17

*Coca-Cola Co. v. Bigio,*
    549 U.S. 1282, 127 S.Ct. 1842 (2007)...........................................8

*Dauer v. Verizon Commc'ns Inc.,*
    613 F. Supp. 2d 446 (S.D.N.Y. 2009) ...........................................14

*Falls Riverway Realty, Inc. v. City of Niagara Falls,*
    754 F.2d 49, 57 (2d Cir. 1985) ....................................................17

*Freihofer v. Hearst Corp.,*
    65 N.Y.2d 135, 490 N.Y.S.2d 735 (1985) .....................................13

*Grad v. Roberts,*
    14 N.Y.2d 70, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 28 (1964) ........................15

*Gulf Oil v. Gilbert,*
    330 U.S. 501, 508 (1947) .............................................................7

*Halio v. Lurie,*
    15 A.D.2d 62, 222 N.Y.S.2d 759, 2nd Dep't 1961.........................11

*Hargett v. N.Y.C. Transit Auth.,*
    640 F. Supp. 2d 450 (S.D.N.Y. 2009) ...........................................14

*Hill v. White,*
    190 F.3d 427, 431 (6th Cir. 1999) ...............................................17

*Iragorri v. United Techs. Corp.,*
    274 F.3d 65 (2d Cir. 2001) ...........................................................7

*Lee v. Sony BMG Music Entmt.,*
    557 F. Supp. 2d 418 (S.D.N.Y. 2008) ...........................................12

Case 1:09-cv-08297-HB   Document 18   Filed 01/21/10   Page 5 of 25

Maran Coal Corp. V. Societe Generale de Surveillance S.A.,
    No. 92 CIV 8728, 1993 US.Dist. LEXIS 12160 (S.D.N.Y. September 2, 1993) ..........7

Murphy v. Am. Home Prods. Corp.,
    58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983). ...................................................15,16

Nunez v. A-T Fin. Info. Inc.,
    957 F. Supp. 438, 443 (S.D.N.Y. 1997) ..............................................................15

Pernet v. Peabody Eng. Corp.,
    20 AD2d 781, 248 N.Y.S.2d 132 .......................................................................15

Presbyterian Church of Sudan v. Talisman Energy, Inc.
    244 F.Supp.2d 289 S.D.N.Y.(2003)..................................................................10

Reyes v. Energy Transp. Corp.,
    1997 WL 256923 (S.D.N.Y. 1997) ....................................................................14

Riddell Sports Inc. v. Brooks,
    872 F. Supp. 73 (S.D.N.Y. 1995) .......................................................................14

Sabetay v. Sterling Drug, Inc.,
    69 N.Y.2d 329, 506 N.E.2d 919 (1987) ..............................................................15

Strategic Value Master Fund, Ltd. v. Cargill Fin. Serv. Corp.,
    421 F.2d 741, 754 (S.D.N.Y. 2006) .....................................................................7

T.W. Elec. v. Pacific Elec. Contractors Ass'n,
    809 F.2d 626, 630-31 (9th Cir. 1987) .................................................................17

Tagare v. NYNEX Network Sys. Co.,
    921 F. Supp. 1146, 1150 (S.D.N.Y. 1996) ...........................................................15

United States v. Diebold, Inc.,
    369 U.S. 654 (1962) ........................................................................................17

Weltover, Inc. v. Republic of Argentina
    753 F. Supp. 1201, 1209 (S.D.N.Y.1991) ...........................................................10

WIWA v. Royal Dutch Petroleum Co.,
    226 F.3d 88, 101 (2d Cir. 2000) ..........................................................................7

Wood v. Duff-Gordon,
    222 NY 88, 118 N.E. 214 .................................................................................15

**RULES**

Fed. R. Civ. P. 56 ……………………………..……………………………........1,16,17

Fed. R. Civ. P.12(b) (6) ……………………………………………………….......1

**OTHER AUTHORITIES**

N.Y. Lab. Law 740 …………………………………………………………........14

PRELIMINARY STATEMENT

Plaintiff Sui-Yang Huang ("Dr. Huang") submits this memorandum of law: (1) in opposition to the motion of defendant Advanced Battery Technology, Inc. ("ABAT"), for an order either (a) dismissing this action on the grounds of *forum non conveniens*, or, in the alternative, (b) dismissing the tort and quasi-contract claims asserted in the First Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b) (6), for failure to state a claim for relief; and (2) in support of his cross-motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on the First Claim of the Complaint.

THE MOTIONS

A. ABAT's Motion to Dismiss

1. *Forum Non Conveniens*

ABAT has moved to dismiss on the ground of *forum non conveniens*. In its moving papers, it attempts to show that it is a Chinese company and that the witnesses and documents — both of which are alleged to be numerous — are in China. Ironically, ABAT's moving papers prove exactly the opposite, namely that ABAT is a United States citizen and that there are exactly ***two*** relevant witnesses and ***less than a dozen*** relevant documents. ABAT has come nowhere near establishing the grounds for a dismissal *forum non conveniens*.

2. Failure to State a Claim

In the alternative, ABAT moves to dismiss Dr. Huang's tort and quasi-contract claims — which are based on the death threats Dr. Huang and his family received — for failure to state a claim. ABAT contends — unimaginably — that someone can threaten to murder a man and his wife and infant child and not be held legally accountable for the emotional devastation caused by

1

his heinous acts.  That, thankfully, is ***not*** the law of the United States.  ABAT's motion to dismiss the quasi-contract and tort claims should be denied.

B. <u>Dr. Huang's Motion for Partial Summary Judgment</u>

Quite remarkably, the declaration in support of ABAT's motion submitted by Zhiguo Fu ("Fu"), ABAT's CEO, and ABAT's own translation of the contract between ABAT and Dr. Huang, together with several other indisputable facts contained in <u>ABAT</u> documents, entitle Dr. Huang to partial summary judgment on his contract claim.

<u>THE UNDISPUTED MATERIAL FACTS</u>[1]

Despite ABAT's clumsy efforts to hide the truth, a simple reading of the record of these motions reveals the following *indisputable* facts:

Both ABAT and Dr. Huang are citizens of the United States. Dr. Huang is a naturalized citizen, with his United States residence in San Francisco.  ABAT, as it admits in its filings with the Securities and Exchange Commission ("SEC"), is a Delaware corporation, with its "principal executive offices" located in New York City. [2]

On August 30, 2008 Dr. Huang signed an employment contract with ABAT ("Employment Contract"), pursuant to which he became ABAT's Chief Technology Officer ("CTO") for a term of 5 years, responsible for research and product development. His employment commenced on September 1, 2008.

ABAT agreed to pay him a salary of $60,000 per year for his work as CTO. He was to be, and actually was, paid in United States Dollars from the New York office.

---

[1] This section is based on the declarations of Dr. Huang, Fu and the exhibit to the declaration of Mark David McPherson.

[2] **In his declaration, Fu claims that ABAT's "headquarters" (or "primary place of business") is in China. That, along with a number of Fu's allegations, is a blatant fabrication. Fu certainly has read his own SEC filings.  He knows he is misstating the truth.**

2

In addition, ABAT agreed to give him and his designee a total of 300,000 shares of ABAT stock: 100,000 to his designee by no later of the than September 30, 2008; and 200,000 to Dr. Huang by November 30, 2008. That never happened. Instead, in January 2009, ABAT gave Dr. Huang and his designee only 60,000 shares – 40,000 to Dr. Huang and 20,000 to his designee.[3]

Over the next eight months, Dr. Huang continually demanded his stock, and said he would sue if he had to. Fu threatened to retaliate if he did.

In August 2009, ABAT wrote Dr. Huang that, due to an unspecified "job change", he was being dropped from ABAT's payroll. Since then, he has received no salary whatsoever from ABAT. Nevertheless, despite Fu's false statements to the contrary (*see*, "ABAT's Defenses," below), Dr. Huang continued to discharge his responsibilities at ABAT until the end of October 2009, when he was summarily and wrongfully discharged.

This action was commenced on September 30, 2009. The very next day, Dr. Huang received a death threat in a text message on his cell phone: ***"If you don't want to die earlier, you must shut up. Otherwise, you shall die no matter where you are in the world."*** The next day he received another death threat: ***"You don't want to die? F\*\*king you."*** Finally, on October 6, 2009, he was sent the following: ***"You don't want to die? Be careful that your whole family will be killed. If you don't believe, wait and see. F\*\*king you."*** On November 17, 2009, Dr. Huang filed an amended complaint. Again, he immediately received a death threat on his cell phone: ***"All of you now have to be careful, waiting to give you wreath, you all are a bunch of big liar."*** (The Chinese word for "wreath" used in the text message is a reference to a specific type of wreath: ***a funeral wreath***.). Given the timing and content of the death threats, one can

---

[3] Fu claims that under the Employment Contract, Huang was to get his shares pro rata over the five year term of the agreement (60,000 shares per year). That, however, is belied by the <u>explicit</u> language of <u>**ABAT's**</u> own translation of the contract. Fu simply made up this allegation "out of whole cloth."

only infer that they came from someone acting on ABAT's behalf.  The physical and emotional effects of these threats on Dr. Huang and his wife are incalculable.  They live in *daily* fear for their lives, but even more so, for their infant daughter.


## CHINESE LAW[4]

### A. Citizenship of the Parties

Dr. Huang became a United States citizen in 2002, and by doing so, he lost his status as a citizen of the People's Republic of China ("PRC") by operation of law.  Article 3 of "The People's Republic of China Nationality Law" provides: "the People's Republic of China does not recognize the Chinese citizens with dual nationality."  Article 9 of the same statute states that: "[a] Chinese citizen who has settled abroad voluntarily or acquired foreign nationality automatically loses [his or her] Chinese nationality."

As shown above, ABAT is a corporation organized and existing under the laws of the State of Delaware in the United States, with its "principal executive offices" in New York City. Its stock is listed for trading in the United States on NASDAQ.  Under PRC law, ABAT, despite having an office in the PRC and subsidiaries in the PRC, is a citizen of the United States. ABAT's papers refer to a production facility in China known as, 黑龙江中强能源有限公司 (Heilongjiang Zhongqing Power Technology Co., Ltd.)  It, however, did not sign the Employment Contract and, from a legal point of view, is not ABAT.  In fact, Fu's declaration refers to it as a "subsidiary."

---

[4] This section is based on the declaration of  Qiqiang Si, a Chinese attorney, explaining several points of Chinese law.

B. Governing Contract Law

Thus, the Employment Contract is between two United States citizens (Dr. Huang and ABAT). Pursuant to the agreement, Dr. Huang and his designee were to receive shares of ABAT – shares traded on NASDAQ. ABAT was to pay Dr. Huang in United States Dollars. His pay checks came from ABAT's New York City headquarters, as did the shares ABAT actually delivered to Dr. Huang and his designee. He pays income tax in the United States. There is no choice of law provision, nor is there a provision to the effect that Dr. Huang would work exclusively in the PRC. Consequently, under PRC law, the Employment Agreement is governed by, and to be interpreted pursuant to, United States law.

C. Jurisdiction Over the Contract Claim

Article II of "The People's Republic of China Labor Contract Law" provides: "Within the People's Republic of China's territory the enterprises, individual economic organizations, private non-enterprise units and other organizations (hereinafter referred to as employer) and the workers to establish labor relations, conclusion, performance, change, discharge or termination of labor contract applicable to this Law." Under PRC 's Labor Contract Law, the "Employer" must be a Chinese company, and the "employee" can be a Chinese or a foreigner. Only an employment contract between a Chinese company and a Chinese/foreign worker will have legal force in China. In our case, a Chinese court will find that the "Employment Contract" is null and void because ABAT is a foreign corporation. Therefore, a Chinese Court will not accept Dr. Huang's contract claim.

D. Jurisdiction Over the Quasi-Contract and Tort Claims

For the same reasons as those described above regarding Dr. Huang's contract claim, Dr. Huang's tort claims are governed by United States law. The mere fact that Dr. Huang was in the

PRC when he received the threatening text messages is irrelevant. He could have been anywhere in the world. Dr. Huang and ABAT are both United States citizens. There is no telling where the text messages originated. United States law would apply.

ABAT'S "DEFENSES"

Fu asserts two "defenses" against Dr. Huang's contract claim in this action. First, in his declaration (paragraphs 16–18 and 21), Fu claims that at the end of the summer of 2009, Dr. Huang "stopped coming to work on time" and when he did, he "frequently would not work the entire day." That is utterly false. However, even if it were true, it is absolutely irrelevant, because it would have happened after ABAT (Fu) – in retaliation for Dr. Huang asserting his rights – effectively fired him by wrongfully refusing to pay him his salary. An employer cannot discharge an employee on one day, and then, when the employee thereafter no longer comes to work, claim the employee has violated his employment agreement. Yet this is the very "logic" employed by ABAT.[5]

Fu claims in paragraph 22 of his declaration that Dr. Huang made "false statements regarding various patent rights." Paragraph IV of the Employment Contract reads *in its entirety* as follows "From the date of signature of this contract, no patent and no pending patent (30 in total) already belonging to Party B [me] may be transferred to, or used by, any third party. Party B hereby guarantees that during the term of the contract, no legal dispute pertaining to these patents and pending patents (30 in total) shall arise." (ABAT's translation is to the same effect.) Those are Dr. Huang's *only* statements regarding "patent rights." Fu provides no details of the

---

[5] In terms of Dr. Huang's value to Fu, it is worth noting during the one year Dr. Huang worked as SABAT's interim CEO (at Mr. Fu's request), the value of the company increased from **$1,000,000** (Huang's father's sale price) to the point where Fu now is in the process of selling the company to ABAT for a reputed **$10,000,000** – a 1,000% increase in value in slightly over one year.

6

alleged "false statements", and for that reason, this allegation should be given no weight.  In fact, there have been *no* claims made against any of Dr. Huang's patents or patent applications, and he has *not* transferred any of his intellectual property or authorized anyone to use it.

In short, ABAT's "defenses" are a sham.

ARGUMENT

POINT I

THE SOUTHERN DISTRICT IS THE APPROPRIATE FORUM

There is a strong presumption in favor of the plaintiff's choice of forum. See *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947) ("Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) ("A court reviewing a motion to dismiss for *forum non conveniens* should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating the points outlined in this case."); *WIWA v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000); and *Maran Coal Corp. V. Societe Generale de Surveillance S.A.*, No. 92 CIV 8728, 1993 US.Dist. LEXIS 12160 at *6 (S.D.N.Y. September 2, 1993). The burden of proof is on the defendant. *Strategic Value Master Fund, Ltd. v. Cargill Fin. Serv. Corp.*, 421 F.2d 741, 754 (S.D.N.Y. 2006).

The leading case on *forum non conveniens* in this Circuit is the *en banc* case *Iragorri v. United Techs. Corp., supra.* There, the Court enumerates the legal criteria for review of *forum non conveniens* motion, including whether an adequate forum exists, the availability of witnesses

7

and evidence in the forum district, plaintiff's motive in electing the particular forum and the public interest.

Not long afterwards, the Second Circuit revisited the doctrine of *forum non conveniens* in *Bigio v. Coca-Cola Company*, 448 F.3d 176 (2d Cir. 2006). In that case, plaintiffs – three members of the Bigio family and a company they controlled – sued the Coca-Cola Company ("Coca-Cola") in the Southern District. The Bigio family had owned property in Egypt that was seized by the Egyptian government in 1953. That property subsequently was sold to Coca-Cola. The Bigio family then brought suit against Coca-Cola in the Southern District. Plaintiffs were Canadian citizens and non-residents of New York State. Coca Cola made a motion to dismiss on the ground of *forum non conveniens*. It argued, in essence, that the plaintiffs were aliens and that there was an adequate alternative forum, in Egypt. The District Court granted Coca Cola's motion. On appeal, the Second Circuit reversed and remanded. The appellate court reasoned that the fact that the New York court would need to apply a "modest application" of Egyptian law was not a problem because "courts of this Circuit are regularly called upon to interpret foreign law without thereby offending the principles of international comity". Also, the fact that there were witnesses abroad was not a problem either. They could be flown into the United States or Letters Rogatory could be issued to the Egyptian courts to collect their testimony. Further, the Second Circuit held that while the balance of convenience should be applied, preference (and weight) must be given to the fact that plaintiffs chose this particular forum for "legitimate reasons". The fact that plaintiffs could sue in Canada was not relevant because Coca Cola was a United States company and it was "perfectly reasonable to sue in the US". The Supreme Court denied an application for a writ of certiorari. *Coca-Cola Co. v. Bigio,* 549 U.S. 1282, 127 S.Ct. 1842 (2007).

The facts presented by this case – far more than those in *Bigio* – require that ABAT's motion must be denied.  First (and foremost), the Chinese courts lack jurisdiction over Dr. Huang's employment claim.  ABAT, as it admits in its SEC filings, is a Delaware corporation, with its principal executive offices in New York City.  It is *not* a Chinese company.   Huang is a United States citizen.  He no longer is a Chinese citizen.  For that reason, as stated by Dr. Huang's Chinese attorney in his affirmation, Chinese law does not allow Dr. Huang to sue ABAT in China on his employment claim.   (ABAT's lawyer states exactly the opposite.  However, his opinion is based on Fu's declaration, which falsely and misleadingly suggests that ABAT's principal executive offices are in China.)   With regard to Huang's tort and quasi-contract claims, *both* sides agree that Dr. Huang could not bring them in China.  Thus, Huang's *only* forum in which to assert his claims is this Court.

Second, New York law governs the Huang's claims. The Employment Contract is between ABAT (*"of the United States," per ABAT's translation of the agreement)* and Huang, both of whom are United States citizens.  Dr. Huang was ABAT's CTO.  The Employment Contract provides that Dr. Huang was to be paid in United States Dollars. (He was paid in United States Dollars, and he was paid from the New York City executive offices.)  He received shares in ABAT, the stock of which is traded on NASDAQ.  While there is no forum selection or choice of law provision in the agreement, Huang assumed and intended at the time he signed the Employment Contract that United States law would apply to its interpretation and enforcement. The death threats occurred in retaliation for Dr. Huang's efforts to enforce his rights.  All of these facts, when taken together, show that the claims are governed by New York law. *And quite significantly, there is nothing in the record – other than the fortuity of the Employment Contract being in Chinese - to suggest otherwise.*

9

Third, as is evident from the facts of this motion, the trial will consist of the testimony of all of *two* witnesses (Fu and Huang). (As argued below, the employment claim actually should be disposed of by summary judgment.) With regard to the death threats, there obviously will be an attempt made to track down the sender(s) of the text messages, but that is, *in absolute terms,* a tiny amount of discovery. Other than that, there will be something like *ten* exhibits, consisting *in total* of about five pages of prose. While Fu claims to speak no English, and the documents are in Chinese, that certainly is no obstacle. Every day in New York City when courts are sitting, trials are being conducted in many languages, Chinese included.

ABAT claims that there will be a number of Chinese witnesses and Chinese language documents to support its "defenses" against Dr. Huang's contract claim. Two responses are in order. First, as shown above, ABAT's "defenses" are a sham. Second, ABAT provides *no* details as to the exact nature of the defenses or the identities of either the witnesses or the documents, which is a necessary element of a *forum non conveniens* motion. See *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 244 F.Supp.2d 289 S.D.N.Y.(2003). (Defendant "has not provided the Court with any information as to the particular witnesses who reside in Canada who would be called. Such a list of witnesses has been held to be a prerequisite for *forum non conveniens* dismissal.") See also *Weltover, Inc. v. Republic of Argentina,* 753 F.Supp. 1201, 1209 (S.D.N.Y.1991) ("In the absence of such information, the Court cannot assess how defendant will be prejudiced by litigation in New York.").

Fourth, public policy strongly suggests that this action remain in the United States. It is an action by a United States citizen against his employer, also a United States citizen, for the

employer's breach of the employment agreement between them.   A Chinese court has no business – and no competency – to adjudicate the claim.

Fifth, in light of all the above, it is obvious that Dr. Huang did not act in a "vexatious" manner in bringing this action in New York.   He really had *no* choice.   It is this Court, or nowhere.

For all the above reasons, ABAT's motion to dismiss for *forum non conveniens* should be denied.

POINT II

THE DEATH THREATS ARE ACTIONABLE

In the Complaint, Dr. Huang asserts four separate legal theories recognized in New York State in support of his claim over the death threats.

A. Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress ("IIED") is a well-established cause of action in the State of New York. In *Halio v. Lurie* 15 A.D.2d 62, 222 N.Y.S.2d 759, (2nd Dep't 1961), plaintiff and defendant had been dating for about two years with a view to marriage. Defendant, however, secretly married another woman. Later, he revealed the marriage in a letter he mailed plaintiff with the express intention of humiliating her in front of her family. As a result, plaintiff became very sick and nervous, and was unable to sleep or eat. Defendant made a motion to dismiss, which the trial court granted. The Appellate Division reversed. The court stated that if mental suffering caused by the defendant's conduct was genuine and extreme and that the results which followed were severe, it will be for the trier of the fact to determine whether such injuries

11

were actually suffered, and whether the conduct of the defendant was such that it may be said that it went beyond all reasonable bounds of decency. The trial court's decision was reversed.

The gravity of the extreme and outrageous conduct in the present case is far greater than in *Halio*.

When Dr. Huang tried to assert his right under Employment Contract through litigation, he received an abusive phone call from Fu followed by a series of death threats that were not only directed to him, but also toward his wife and six-month-old infant. The physical and emotional effects of these threats on Dr. Huang and his wife are incalculable. They live in ***daily*** fear for their lives, but even more so, for their infant daughter.

Under New York law, to make a valid claim of IIED, defendant's conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society. *Lee v. Sony BMG Music Entmt.*, 557 F. Supp. 2d 418 (S.D.N.Y. 2008). A claim for IIED requires a plaintiff to demonstrate (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Torain v. Clear Channel Broad., Inc.*, 2009 WL 2777177 (S.D.N.Y. 2009); *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350 (1993).[6]

Another New York case on IIED worth mentioning is *Donohue v. Teamsters Local 282*, 12 F. Supp. 2d 273 (E.D.N.Y. 1998). In that case, plaintiff, a former union fund manager claimed that vandalism to her property and threats of physical harm prevented her from disclosing alleged improprieties in the operation of the funds. In a motion to dismiss, the Court held that plaintiff

---

[6] The facts in this case are far more different than in our case. In this case, the plaintiff asserts that a newspaper published a photograph of her without her consent that caused her severe emotional distress. The plaintiff's claim of IIED was dismissed.

satisfied her burden of alleging "extreme and outrageous" conduct, and state a claim of IIED under New York law.

IIED is not only recognized by New York Law, but also recognized in many other jurisdictions. *Nims v. Harrison*, 768 So. 2d 1198 (Fla. Dist. Ct. App. 2000) (A high school teacher stated cause of action against students for IIED, by alleging that the students participated in production and distribution of newsletter in which author threatened to kill the teacher and to rape her and all of her children); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125 (D. Mass. 1982) (A former church member's allegation that, pursuant to church doctrine, agents of church engaged in course of conduct, including slanderous telephone calls to her neighbors and employer, physical threats, and assault with automobile, which was designed to dissuade her from pursuing her legal rights, stated claim upon which relief could be granted for IIED); *Simpson v. Burrows*, 90 F. Supp. 2d 1108 (D. Or. 2000) (Letters circulated by town resident concerning lesbian owner of town lodge, which letters contained hostile, vitriolic, and inflammatory anti-lesbian language and expressed death threats, amounted to an extraordinary transgression of the bounds of socially tolerable conduct.)

The death threats in the present case are every bit as horrifying as the conduct just described.

B. Prima Facie Tort

Where relief may be afforded under traditional tort concepts, the concept of prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort. However, where a traditional tort remedy exists, a party will not be foreclosed from pleading, as a basis for alternative relief, a cause of action for prima facie tort. *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735 (1985). Thus, if there was no other

viable theory available to Dr. Huang, prima facie tort likely could not stand alone as his sole claim. However, in the Complaint, Dr. Huang did make prima facie tort claim as an alternative to his other traditional claims.

The elements for a cause of action for prima facie tort are (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73 (S.D.N.Y. 1995). Dr. Huang has pleaded facts sufficient to state a claim for prima facie tort.

C. Retaliation

To establish a common law retaliation claim, an employee must show that (1) he was engaged in a protected activity, (2) his employer was aware of that activity, (3) he suffered a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse employment action. *Hargett v. N.Y.C. Transit Auth.*, 640 F. Supp. 2d 450 (S.D.N.Y. 2009); *see also Dauer v. Verizon Commc'ns Inc.*, 613 F. Supp. 2d 446 (S.D.N.Y. 2009).

In *Reyes v. Energy Transp. Corp.*, 1997 WL 256923 (S.D.N.Y. 1997), plaintiff brought an action against a corporation, alleging that it refused to employ, hire, or otherwise engage him in retaliation for his providing testimony in a personal injury claim brought by another individual against the same defendant corporation. The plaintiff had been regularly employed by the defendant as a merchant seaman for the six years preceding his testimony in the personal injury case. After giving this testimony, the plaintiff was rejected each time that he submitted his name to fill a vacancy on one of the defendant's ships. The plaintiff brought two retaliation claims against the defendant for its failure to hire him. One claim was under N.Y. Lab. Law 740; the

other under the common law. On a motion to dismiss, the District Court granted the motion as to the statutory claim, but denied it as to the common law claim.

The facts of the case - the refusal to pay Dr. Huang his salary, his firing, the death threats - evidence common law retaliation.

## D. Breach of Implied Contractual Covenant of Good Faith

Several New York cases stating the broad proposition that New York courts have declined to adopt an implied covenant of good faith in the employment relationship. *See, e.g., Brady v. Calyon Sec. (USA)*, 406 F. Supp. 2d 307 (S.D.N.Y. 2005); *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983); *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 506 N.E.2d 919 (1987). These cases, however, tend to arise when an otherwise at-will employee is attempting to challenge his termination from employment. According to the Employment Contract, Dr. Huang was not an at-will employee, as he was hired for a fixed period and the employment relationship could not be terminated except with "mutual consents."

Every contract (other than an agreement for employment at will) under New York law includes 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.' *Grad v. Roberts*, 14 N.Y.2d 70, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 28 (1964), quoted in *Tagare v. NYNEX Network Sys. Co.*, 921 F. Supp. 1146, 1150 (S.D.N.Y. 1996)."); *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 443 (S.D.N.Y. 1997). Furthermore, New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of the party to a contract may be implied and, if implied, will be enforced (*e.g., Wood v. Duff-Gordon*, 222 NY 88 [118 N.E. 214]; *Pernet v. Peabody Eng. Corp.*, 20 AD2d 781 [248 N.Y.S.2d 132]).

15

In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983).

Fu intentionally held back the shares that Dr. Huang was entitled to pursuant to the clear and unambiguous wording of the Employment Contract. After Dr. Huang had a conversation with Fu in July, requesting the remaining shares, Fu issued a memorandum and removed Dr. Huang from the payroll of ABAT on August 4, 2009 and began to pay him a reduced salary of $17,000 per year in Chinese currency from *SABAT,* which is owned by Fu personally. Having no other choice, Dr. Huang commenced litigation against ABAT on September 30, 2009. On the very next day, Dr. Huang received a threatening phone call from Fu. Dr. Huang also received the first death threat text message. On October 2 and October 6, two more death threat messages were sent to Dr. Huang, the wording of which is shocking. All three of the notices were sent to Dr. Huang during his employment. October 25, 2009, Fu sent Dr. Huang a notice, in which Fu unilaterally fired Dr. Huang as CTO and re-hired him as "Technical Engineer". In the very same Notice, Fu ordered Dr. Huang to report to work over 1,800 miles away from his home. If such conduct does not constitute "bad faith", nothing does.

## POINT III

## DR. HUANG IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

A. The Standard for Summary Judgment

Summary judgment should be entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   While a court must

examine all the evidence in the light most favorable to the non-moving party (*United States v. Diebold, Inc.*, 369 U.S. 654 (1962)), the moving party may discharge its burden by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.   This shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   In weighing evidence on summary judgment, the court does not make credibility determinations or weigh conflicting evidence.  *See, T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).   The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).   Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat a summary judgment motion.   *See, Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 57 (2d Cir. 1985).   Summary judgment is appropriate if the evidence favoring the non-moving party is merely colorable or is not significantly probative.  *See Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999).

B. <u>ABAT Effectively Admits</u>
   <u>It Breached the Employment Comntract</u>

It is "hornbook law" that the elements of a claim for breach of contract are: (1) a contract; (2) performance by plaintiff of any conditions precedent; (3) a breach by the defendant; and (4) damages proximately resulting from the breach. Here, the undisputed facts establish all four elements.

First, the parties agree that there was an agreement between them, written in Chinese (the Employment Contract), and they agree as to the contents of the agreement in Chinese.  They also agree in all material respects to the translation of that document into English. Specifically, they agree that pursuant to the contract, Dr. Huang became ABAT's CTO for a term of 5 years as of September 1, 2008.   In addition, they agree that ABAT was to pay Dr. Huang a salary of

$60,000 per year and  to give Dr. Huang and his designee a total of 300,000 shares of ABAT: 100,000 to his designee by no later of the than September 30, 2008 and 200,000 to Dr. Huang by November 30, 2008.

Second, it is undisputed that Dr. Huang began work as scheduled on September 1, 2008, and was still acting as ABAT's CTO on (and after) November 30, 2008, the date by which all the ABAT stock was to have been transferred.

Third, it is also undisputed that ABAT did not deliver the promised ABAT stock to Dr. Huang's designee by September 30, 2008, or to Dr. Huang himself by November 30, 2008. Instead, in January, 2009, ABAT gave Dr. Huang and his designee only 60,000 shares, 40,000 to Dr. Huang and 20,000 to his designee.  It is also undisputed that ABAT unilaterally stopped paying Dr. Huang as of August 1, 2009, giving as its only reason an unspecified "job change." Both of these actions constitute breaches of the Employment Contract.

C. ABAT's Potential Defenses Are Bogus

Fu asserts two "defenses" against Dr. Huang's contract claim: Dr. Huang essentially stopped coming work in August 2009; and (2) Dr. Huang made "false statements regarding various patent rights."    These defenses are debunked above.  They are no impediment to Dr. Huang obtaining summary judgment.

D. Dr. Huang Is Entitled To Partial Summary Judgment

The undisputed facts establish that ABAT breached the Employment Contract, and that ABAT's defenses are bogus. Dr. Fu is entitled to a summary judgment of liability.[7]

---

[7] In order for there to be a judgment awarding damages, there will need to be subsequent (summary) proceedings concerning: (a) the damages suffered by Dr. Huang and his designee occasioned by ABAT's failure to provide them the stock as and when it was obligated to do so; and (b) the amount due Dr. Huang as a result of ABAT stopping his salary in August 2009 and firing him in October of the same year.

CONCLUSION

For the reasons set forth above and in the accompanying declarations of Plaintiff Sui-Yang Huang and Qiqiang Si, together with the exhibits annexed thereto, and upon all of the pleadings and proceedings heretofore had herein, the motion to dismiss of defendant Advanced Battery Technology, Inc. should be denied in its entirety, and the motion of Plaintiff Sui-Yang Huang  for partial summary judgment should be granted in all respects.

Dated: January 21, 2010

                                                      Dai & Associates, P.C.

                                                      By:

                                                    John J. O'Connell (JO-1934)
                                         Attorneys for Plaintiff Sui-Yang Huang
                                         136-20[th] Avenue, Suite 9F
                                         Flushing, New York 11354
                                         718-888-8880

*Of Counsel*

     Charlotte Xiaolan Lan, Esq.

19